**WALTER E. HELLER & COMPANY SOUTHEAST, a Georgia Corporation, Plaintiff-Appellant,**

v.

**RIVIANA FOODS, INC., a Delaware Corporation, Defendant-Appellee.**

No. 80–5893.

United States Court of Appeals, Fifth Circuit. Unit B

June 26, 1981.

Douglas H. Morford, Jacksonville, Fla., for plaintiff-appellant.

David R. Lewis, Jacksonville, Fla., for defendant-appellee.

Before HILL, FAY and HENDERSON, Circuit Judges.

OPINION

PER CURIAM:

Defendant, Riviana Foods, Inc. (hereinafter "Riviana"), entered into a warehouse agreement with Bill Amos Brokerage Co., Inc., (hereinafter "debtor" or "Amos"), by

---

which it would deliver foods to Amos for storage and delivery to defendant's military customers. When these goods were sold by defendant's military sales brokers, defendant would notify Amos to deliver the merchandise to its customers, and upon proper proof of delivery defendant would pay Amos a sum equal to 6½% of the invoice price. There is no dispute that under this agreement Bill Amos was not permitted to sell and never did sell defendant's goods to anyone, that defendant billed its customers and collected payment for its sales, and that Amos was never invoiced, billed, or credited for any of defendant's goods stored in Amos's warehouse.

In order to obtain capital, Amos entered into an inventory loan security agreement and an accounts financing security agreement with plaintiff's predecessor in interest, First National-Heller Factors, Inc. By these agreements, plaintiff obtained a security interest in the inventory, including the after-acquired inventory, of the debtor. On January 22, 1979, Amos filed a voluntary petition for bankruptcy. On this date defendant had stored in Amos's warehouse approximately $23,000 worth of goods, which it subsequently had removed.

Plaintiff brings this suit claiming that the arrangement between defendant and Amos constituted a "sale or return" as that term is used in Fla.Stat. § 672.2–326(3),[1] and, therefore, its security interest attached to the goods. Plaintiff also claims that when defendant sold the goods to its customers and ordered delivery by Amos, the transaction constituted a "sale and buy back." Since plaintiff alleges that consideration for the "buy back" was the cancellation of a preexisting debt, it contends defendant was not a "buyer in the ordinary course of business" as that term is used in Fla.Stat. § 679.9–307.[2] See, Fla.Stat. 671.-1–201(9). Plaintiff, therefore, claims that its security interest attached to all goods in Amos's warehouse after May 1, 1978, and requests an accounting for those goods sold or removed by Riviana.

The case is presently before the Court on the parties' cross motions for summary judgment. A hearing was held on April 16, 1980, during which it became apparent that there is no disputed question of material fact. The parties disagree only on the legal consequences of the undisputed facts as detailed above.

The crucial question is whether the transactions between defendant and Amos constituted a "sale or return" as that term is used in Fla.Stat. § 672.2–326. If not, plain-

---

1. *Sale on approval or return; consignment sales and rights of creditors.*

   (1) Unless otherwise agreed, if delivered goods may be returned by the buyer even though they conform to the contract, the transaction is:

   (a) A "sale on approval" if the goods are delivered primarily for use, and

   (b) A "sale or return" if the goods are delivered primarily for resale.

   (2) Except as provided in subsection (3), goods held on approval are not subject to the claims of the buyer's creditors until acceptance; goods held on sale or return are subject to such claims while in the buyer's possession.

   (3) Where goods are delivered to a person for sale and such person maintains a place of business at which he deals in goods of the kind involved, under a name other than the name of the person making delivery, then with respect to claims of creditors of the person conducting the business the goods are deemed to be on sale or return. The provisions of this subsection are applicable even though an agreement purports to reserve title to the person making delivery until payment or resale or uses such words as "on consignment" or "on memorandum". However, this subsection is not applicable if the person making delivery:

   (a) Complies with an applicable law providing for a consignor's interest or the like to be evidence by a sign, or

   (b) Establishes that the person conducting the business is generally known by his creditors to be substantially engaged in selling the goods of others, or

   (c) Complies with the filing provisions of the chapter on secured transactions (chapter 679).

   · · · ·

2. *Protection of Buyers of Goods.*

   (1) A buyer in ordinary course of business (subsection (9) of Section 671.1–201) other than a person buying farm products from a person engaged in farming operations takes free of a security interest created by his seller even though the security interest is perfected and even though the buyer knows of its existence.

tiff's security interest never attached and defendant is entitled to summary judgment. Defendant admits that Amos maintained a place of business at which he dealt in goods of the kind involved under a name other than that of defendant. Defendant also admits that none of the three exceptions contained in § 672.2–326(3) are applicable. However, by its terms this section applies only if the goods were delivered "for sale." Defendant contends that the goods were delivered to Amos not for sale but for storage only.

Under some circumstances, goods delivered for further delivery to the deliveror's customers can be reached under § 2–326(3) of the Uniform Commercial Code.[3] Plaintiff cites two cases to this effect, *General Electric Co. v. Pettingell Supply Co.*, 347 Mass. 631, 199 N.E.2d 326 (1964), and *Manufacturer's Acceptance Corporation v. Penning Sales, Inc.*, 5 Wash.App. 501, 487 P.2d 1053 (1971). However, these cases present a different factual situation than that presently before the Court.

In *General Electric Corporation, supra*, General Electric had delivered certain large lamps to Pettingell Supply Company. Seventy-four percent of those lamps were redelivered by Pettingell to subagents pursuant to sales made by General Electric. This arrangement is similar to the one between Amos and defendant. However, 26% of Pettingell's sales were direct sales which it had negotiated with its own customers. It was on the basis of this second aspect of Pettingell's operation that the Court found § 2–326 applicable. "We need not determine the ruling required if Pettingell's sole authority had been to distribute lamps to subagents. Since Pettingell had authority to sell the lamps, they were 'delivered' to Pettingell 'for sale.'" 199 N.E.2d at 329.

The decision in *Penning Sales, Inc., supra*, turned on the identical consideration. In that case, Penning acted both as agent for Walter W. Boysen Co., distributing Boysen's paints to its other dealers, and as a retailer of paints supplied by Boysen. Because of Penning's retail operation, the court found its creditors could reach the paint held for Boysen.

In both *General Electric* and *Penning Sales*, though most of the goods were shipped on to other customers of the supplier, the debtor had the authority to, and did, sell the merchandise at retail. The instant case, however, presents a situation much more similar to that in *Allgeier v. Campisi*, 117 Ga.App. 105, 159 S.E.2d 458 (1968). In *Allgeier* plaintiff had entrusted her car to a dealer who was authorized to receive offers, but had no authority to sell the car without the specific approval of the plaintiff. Defendant, who had a security interest in the dealer's inventory, sought possession of the car under U.C.C. § 2–326(3). The court held that plaintiff had not delivered the car to the dealer for sale, and it could not be reached under § 2–326(3).

Plaintiff argues that under Fla.Stat. § 672.2–403,[4] Amos had the right to sell the

---

3. From which Fla.Stat. § 672.2–326(3) is taken.

4. *Power to transfer; good faith purchase of goods; "entrusting".*

(1) A purchaser of goods acquires all title which his transferor had or had power to transfer except that a purchaser of a limited interest acquires rights only to the extent of the interest purchased. A person with voidable title has power to transfer a good title to a good faith purchaser for value. When goods have been delivered under a transaction of purchase the purchaser has such power even though:
(a) The transferor was deceived as to the identity of the purchaser, or
(b) The delivery was in exchange for a check which is later dishonored, or
(c) It was agreed that the transaction was to be a "cash sale", or
(d) The delivery was procured through fraud punishable as larcenous under the criminal law.

(2) Any entrusting of possession of goods to a merchant who deals in goods of that kind gives him power to transfer all rights of the entruster to a buyer in ordinary course of business.

(3) "Entrusting" includes any delivery and any acquiescence in retention of possession regardless of any condition expressed between the parties to the delivery or acquiescence and regardless of whether the procurement of the entrusting or the possessor's disposition of the goods have been such as to be larcenous under the criminal law.

(4) The rights of other purchasers of goods and of lien creditors are governed by the chapters on secured transactions (chapter 679), bulk transfers (chapter 676) and documents of title (chapter 677).

goods in spite of the fact that no such right was included in the contract. In fact, this statute gives Amos the power to transfer title to a bona fide purchaser; it does not give it the right, as against defendant, to sell the property.

Thus, it appears that Fla.Stat. 672.2–326(3) strikes a balance between the desire of the supplier to maintain an interest in his goods and that of the creditor in relying on the apparent wealth of his debtor. This balance is drawn in terms of the control exercised by the supplier over the goods in the possession of the debtor. In *Pettingell* and *Penning Sales*, the debtor had the independent authority to sell the product at retail even though it also acted as an agent of the supplier. In *Allgeier*, in contrast, the debtor was authorized to act only as agent of the owner. The facts are uncontroverted that Amos acted only as warehouseman for defendant and had no independent authority to sell defendant's merchandise. Therefore, in this case the balance must be drawn in favor of defendant, and the Court will this day enter summary judgment for defendant.

ISSUED at Jacksonville, Florida, this 8 day of July, 1980.

### ORDER DENYING MOTION TO ALTER OR AMEND SUMMARY FINAL JUDGMENT

This cause is before the Court on plaintiff's Motion to Alter or Amend Summary Final Judgment entered against it on July 8, 1980. Plaintiff moves to amend on three grounds: that entry of judgment has the effect of providing consignors with a "hidden lien"; that the Court erred in failing to consider the applicability of Article 9 of the Uniform Commercial Code; and that the Court failed to recognize a disputed factual issue which rendered summary judgment inappropriate.

On the first point, the Court remains convinced that delivery of food from Riviana to Amos, its distributor and Heller's debtor, should not be considered a "sale" for purposes of Uniform Commercial Code § 2–326 (Fla.Stat. § 672.2–326).

Even if a sale could be found—and close examination of the record discloses none—the Court declines to read § 2–326 literally. The statute is intended to minimize prejudice to creditors of consignees. As ¶ 2 of the Official Comment to § 2–326 notes, "The purpose of the exception is merely to limit the effect of the present subsection itself ... to cases in which creditors of the buyer may reasonably be deemed to have been misled by the secret reservation." Plaintiff extended credit to Amos pursuant to its security agreement before any of the goods involved in this case were shipped to Amos by Riviana. The possibility that a "hidden lien" on its debtor's inventory misled the plaintiff at the time it extended credit is, therefore, minimal. *See GBS Meat Industry Pty. Limited v. Kress-Dobkin, Inc.*, 474 F.Supp. 1357, 1362 (W.D.Pa. 1979).

Plaintiff's contention that the provisions of Article 9 mandate recovery has been presented in conclusory form only. The Court declines to hold that Article 9 applies to this case.

Finally, plaintiff argues that the Court misconstrues Amos's authority to sell stored merchandise when the Court says, in the Opinion of July 8,

> There is no dispute that under this agreement Bill Amos was not permitted to sell and never did sell defendant's goods to anyone, that defendant billed its customers and collected payment for its sales, and that Amos was never invoiced, billed, or credited for any of defendant's goods stored in Amos's warehouse.

In its motion to alter or amend, plaintiff characterizes this as "an inaccurate statement relating to whether or not there was any dispute with respect to Amos's authority to sell defendant's goods. The contract between Amos and defendant contained no prohibition with respect to such sales." For plaintiff, this gloss on a "disputed fact" renders summary judgment inappropriate.

That plaintiff's argument goes to the legal import of undisputed facts, and not to a dispute as to the facts themselves, is borne out by an examination of the transcript of oral argument before the Court on April 16, 1980.

The Court: Amos was not permitted and never sold any of the goods to anyone.

Mr. Morford: Your Honor, we do have contention with respect to that particular fact.

The contract that was entered into between the parties and to which there is not a dispute, speaking for itself and attested to by Mr. Hunnell's deposition, does not prohibit the sales. *I would concede there is no evidence any such sales took place.* However, I think it's important to point out that the contract did not prohibit such sales; secondly, under the Uniform Commercial Code section 2–403, which is the entrusting provision of the sales article, the debtor, Bill Amos, would have had the legal right to sell the goods and pass title because he was a dealer in goods of that kind.

The Court: So you are in agreement with the fact that Amos never sold any goods to anyone?

Mr. Morford: Yes, however, we contend the contract did not prohibit the sales, and in fact, he could have made such sales under the Code. *We agree none were made.* (Emphasis supplied).

The Court regrets any ambiguities in the Opinion of July 8, agreeing that the statement, "There is no dispute that under this agreement Bill Amos was not permitted to sell," is subject to misinterpretation. It is undisputed that Amos had *no specific authority to sell.* The Court's Opinion of July 8 should be read with that addendum in mind. There was no written agreement which permitted Amos to sell—and plaintiff concedes that no such sales took place. That remains, for the Court, the central "fact" at issue. Any dispute as to the legal effect of the silent contract is one of law only. Finding no genuine issue of material fact, the Court remains of the opinion that summary judgment was appropriately entered in favor of defendant. Accordingly, it is

ORDERED that plaintiff's Motion to Alter or Amend Summary Final Judgment, filed herein on July 18, 1980, is denied.

DONE AND ORDERED at Jacksonville, Florida, this 10 day of October, 1980.