**In re Gordon & Joan ZWAGERMAN, d/b/a Zwagerman Farms, Debtors.**

**James D. ROBBINS, Trustee, Plaintiff–Appellant,**

v.

**COMERICA BANK–DETROIT, Red River Company, David Bradley, and the United States of America, acting through the Farmers Home Administration, Defendants–Appellees.**

**COMERICA BANK–DETROIT, Defendant–Appellant,**

v.

**RED RIVER COMPANY, David Bradley, and the United States of America, acting through the Farmers Home Administration, Defendants–Appellees.**

Bankruptcy Nos. 85–02901, 1:90–CV–736 and 1:90–CV–742.
Adv. No. 86–0375.

United States District Court,
W.D. Michigan, S.D.

April 4, 1991.

---

Robert A. Hendricks, Varnum, Riddering, Schmidt and Howlett, Grand Rapids, Mich., for plaintiff-appellant.

Robert F. Wardrop, II, Hunter M. Meriwether, Agnes Kempker–Cloyd, U.S. Asst. Atty., Grand Rapids, Mich., for defendants-appellees.

## OPINION

ROBERT HOLMES BELL, District Judge.

These are consolidated appeals from a decision of the United States Bankruptcy Court for the Western District of Michigan in an action arising out of the bankruptcy of Gordon and Joan Zwagerman, d/b/a Zwagerman Farms (hereinafter "Zwagerman" or "the debtors"). 115 B.R. 540.

Bankruptcy Trustee James D. Robbins (hereinafter "Trustee") and Comerica Bank–Detroit (hereinafter "Comerica") appeal the bankruptcy court's decision that at the time the debtors filed their bankruptcy petition, all cattle in the debtors' possession belonged to Defendant David Bradley (hereinafter Bradley) d/b/a the Red River Company, were not subject to the security interest of Comerica, and were not part of the estate. The trustee further appeals the bankruptcy court's determination that Zwagerman's payments to Bradley during the period commencing 90 days prior to the date of the filing of the petition were not subject to avoidance as preferential transfers.

## FACTS

The facts are generally undisputed. Since approximately 1969 the debtors, Gordon and Joan Zwagerman, operated a farm at which they fattened hogs and cattle and sold them for slaughter. Beginning in November 1981 until they filed their Chapter 7 bankruptcy petition on December 30, 1985, the debtors engaged in a practice known as "custom feeding". David Bradley, d/b/a the Red River Company, would furnish cattle under fattening agreements. Zwagerman would feed the cattle until they weighed approximately 1100 pounds, after which time Zwagerman would sell the cattle as Bradley's agent at an agreed upon price. Upon sale, the proceeds were to be delivered to Bradley and Zwagerman would be paid for the poundage the cattle gained after delivery.

When Bradley's first shipment came to the Zwagerman's there were other cattle on the farm belonging to Zwagerman. There were no ear tags, brands or other marks to differentiate between the cattle. Periodically during the next 4 years the Zwagermans purchased some cattle from others including Bradley.

In 1983 Comerica refinanced a loan to Zwagerman and extended further credit on the assumption that Zwagerman was the owner of all the cattle on his farm despite the fact that one of the earnings work sheets showed "custom cattle" as an entry separate from "cattle" in the amount of $208,232.00 for the period ending March 31, 1983.

From November 1981 until December 1985 Bradley shipped over 8204 cattle to Zwagerman under fattening agreements. Accounting was done on a first in first out (FIFO) basis. Generally it took between 90 to 140 days to fatten the cattle. However, payments slowed down, and by December 1985 Bradley was applying payments to invoices already 14 months old.

When the debtors filed their bankruptcy petition the Trustee took possession of the cattle, sold them, and deposited the proceeds of approximately $288,000 in an account to be distributed when the competing claims were resolved in an adversarial hearing. Debtors had made a total of $261,882.84 in payments to Bradley by checks dated in the 90 day preference period.

At the adversarial hearing Bradley contended that because he retained ownership in the cattle and the relationship between himself and the Debtor was only a bail-

ment, the proceeds are held for his benefit by constructive trust.

Comerica claimed that the Bradley/Debtor relationship was not a bailment, but rather a consignment subject to § 2–326(3) of the Uniform Commercial Code. M.C.L.A. § 440.2326(3); M.S.A. § 19.2326(3). Accordingly, Comerica contended that its properly perfected security interest gave it an interest in the proceeds which had priority over Bradley's interest.

The Trustee argued that Bradley's interest was a consignment subject to UCC § 2–326(3) and not a bailment. Thus, the Trustee asserted that Comerica had a superior interest in the proceeds. In the alternative, based on the trustee's status as hypothetical lien creditor under 11 U.S.C. § 544, the proceeds were property of the estate, and all the payments the Debtors made to Bradley for cattle sales within ninety days of the bankruptcy are voidable as preferences.

At the adversarial hearing two purchasers of Zwagerman's cattle testified that they believed Zwagerman owned the cattle he was selling in part because they were selling him cattle during this period and in part because Zwagerman represented that they were his.

An expert in the practice and custom of the livestock feed industry testified that prior to 1986 he was not aware of anyone with an interest in custom fed cattle who filed a financing statement.

The bankruptcy court found that the relationship between Zwagerman and Bradley was one of bailment, and that Bradley retained title to the cattle. Moreover, since the cows were not delivered to Zwagerman "for sale" the bankruptcy court held that UCC § 2–326(3) did not apply, and Bradley was entitled to the proceeds of the cattle. The court further held that the prepetition payments to Bradley were not voidable as preferences. Comerica and the Trustee appealed.

*Standard of Review*

■ This court is bound by the clearly erroneous standard of review for factual determinations made by the bankruptcy judge, and due regard is to be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses. Bankr.R. 8013. The Sixth Circuit has repeatedly enunciated that findings of fact of a bankruptcy court should not be disturbed unless there is "most cogent evidence of mistake or miscarriage of justice." *In re Caldwell,* 851 F.2d 852, 857 (6th Cir.1988) (and cases cited therein).

The *de novo* standard of review is applicable to legal determinations. *In re Caldwell,* 851 F.2d at 857. The first concern on appeal is identifying whether the issue on appeal is one of fact or of law. The Trustee and Comerica characterize the dispute on appeal as purely a legal question centering on the interpretation given to the language of UCC § 2–326. Thus, they contend that a *de novo* standard applies. Bradley, on the other hand, contends that the underlying dispute is a question of fact concerning whether the delivery of the cattle was "for sale."

■ In a case such as this, where the question revolves around the applicability of a statute, the bankruptcy court's interpretation of the statute, specifically its reading of what must be proved before the statute will be applied, constitutes a conclusion of law subject to plenary review. *Truck Drivers Local 807 v. Carey Transportation, Inc.,* 816 F.2d 82, 88 (2nd Cir. 1987). If the bankruptcy court correctly interprets the statute, however, its conclusions as to whether there is compliance with the statute generally involves factual findings which can be reversed only if clearly erroneous. *Id.*

*Application of UCC § 2–326(3)*

Bradley characterizes his arrangement with Zwagerman as a bailment. Bradley contends he retained ownership of the cattle and Zwagerman did not obtain a sufficient interest in the cattle to support the attachment of a security interest by his creditors.

■ Under the common law, in the case of a true bailment, the bailee does not have sufficient interest in the goods to support the attachment of a security interest. *Roh-*

*weder v. Aberdeen Production Credit Association,* 765 F.2d 109 (8th Cir.1985); *In re Cook,* 63 B.R. 789, 796 (B.C.N.D.1986).

The crucial question in this regard is the parties' intent. . . . [I]f the parties intended to create a bailment, with Rohweder retaining complete ownership of the cows and relinquishing only possession, Bellman would not have sufficient rights for attachment of PCA's lien and, in the absence of an estoppel, Rohweder should prevail.

*Rohweder,* 765 F.2d at 113.

Under the common law analysis it is clear that Bradley intended to retain complete ownership of the cattle, so the cattle would not be subject to the Comerica's lien and would not be property of the bankrupt estate.

Unfortunately, the analysis required in this case is not so simple. The Trustee and Comerica argue that the common law has been altered by UCC § 2–326(3), and that under this statute the subjective intent of Zwagerman and Bradley is not important. *Bischoff v. Thomasson,* 400 So.2d 359 (Ala. S.Ct.1981); *Georgia–Pacific v. Walter E. Heller & Co.,* 37 UCC 735, 740, 440 So.2d 666 (Fla.App.1983).

A transaction is a "sale or return" if the goods are delivered primarily for resale. UCC § 2–326(1)(b). Goods "held on sale or return" are subject to the claims of the buyer's creditors while in the buyer's possession. UCC § 2–326(2). Goods are *deemed* to be "held on sale or return" if they fall within the parameters of UCC § 2–326(3) which provides in part[1]:

(3) Where goods are delivered to a person for sale and such person maintains a place of business at which he deals in goods of the kind involved, under a name other than the name of the person making delivery, then with respect to claims of creditors of the person conducting the business the goods are deemed to be on sale or return. The provisions of this subsection are applicable even though an agreement purports to reserve title to the person making delivery until payment or resale or uses such words as "on consignment" or "on memorandum". . . .

The Trustee and Comerica argue for a liberal interpretation of the statute because the official comment to this section indicates subsection (3) was meant to resolve "all reasonable doubts as to the nature of the transaction in favor of the general creditors of the buyer." UCC § 2–326, Comment 2. Nevertheless, a liberal interpretation does not include the rewriting of unambiguous phrases.

■ The statute is clear. Before goods will be deemed to be on "sale or return" under UCC § 2–326(3), 3 elements must be satisfied:

1. the goods are delivered for sale;

2. the person maintains a place of business at which he deals in goods of the kind involved; and

3. the person deals under a name other than the name of the person making delivery.

*In re Miller,* 119 B.R. 660, 664 (B.C.W.D. Ark.1990); *In re KLP, Inc.,* 7 B.R. 256, 257 (B.C.N.D.Ga.1980).

"[B]y its terms this section applies only if the goods were delivered 'for sale'." *Walter E. Heller & Co. S.E. v. Riviana Foods, Inc.,* 648 F.2d 1059, 1061 (5th Cir. 1981).

Thus, it appears that Fla.Stat. 672.2– 326(3) strikes a balance between the desire of the supplier to maintain an interest in his goods and that of the creditor in relying on the apparent wealth of his debtor. This balance is drawn in terms of the control exercised by the supplier over the goods in the possession of the debtor.

*Id.* at 1062.

■ Where delivery of the goods was not "for sale", courts have routinely held that UCC § 2–326(3) does not apply. For

---

1. It is undisputed that the exclusions found in § 2–326(3)(a), (b) and (c) do not apply to the facts of this case. No applicable sign law exists, the Debtors were not known by their creditors to be engaged in selling the goods of others, and Bradley stipulated that he did not file a financing statement.

example, in *In re Key Book Service, Inc.*, 103 B.R. 39, 43 (B.C.D.Conn.1989), the court held that § 2–326 was inapplicable because the contemplated sale was to be by the bailor. In *In re Sitkin Smelting and Refining, Inc.*, 639 F.2d 1213 (5th Cir. 1981), the court found a bailment and not a consignment under UCC § 2–326 where the goods were not delivered for resale with an option to return. In *Riviana* the court held that 2–326(3) did not apply where the debtor acted only as warehouseman for defendant and had no independent authority to sell defendant's merchandise. 648 F.2d at 1062. In *In re Medomak Canning Co.*, 25 U.C.C.Rep.Serv. 437 (Bankr.D.Me. 1977), the court held that the transaction did not constitute a "sale or return" where the parties contemplated merely that the holder of the goods would process the goods entrusted to it for later sale by the owner.

The Court recognizes that other courts with facts similar to those present in the Zwagerman matter have reached differing results. Yet it cannot be said that the courts have completely ignored the statutory requirement that the goods be delivered "for sale". They have merely made a factual finding that the delivery was in fact, if not in word, "for sale".

The most recent case relied on by the Trustee and Comerica is *In re Miller*, 119 B.R. 660 (B.C.W.D.Ark.1990). In *In re Miller*, the court held that grain delivered to the debtor for storage came within the scope of 2–326(3) because it was being held for ultimate sale. The parties contemplated that the seed would be sold when the market price reached an acceptable level, and the storage arrangement merely served as an interim measure. 119 B.R. at 667. Thus, regardless of the parties' characterization of the arrangement, the true purpose of the arrangement was "for sale".

The other case on which the Trustee and Comerica place great reliance is *First National Bank of Blooming Prairie v. Olsen*, 403 N.W.2d 661 (Ct.App.Minn.1987). In that case the court quoted *In re Novak*, 7 UCC 196 (Md.Cir.Ct.1969), for the proposition that it was not improper "to give broader application to section 2–326(3) to include transactions in which goods are delivered at least in great part for ultimate sale." The court, without providing factual detail, found that the cattle delivered to the feedlot in *Olsen* came within the terms of UCC 2–326(3) because the investor-owners delivered possession of cattle to Olsen, who was engaged in the business of selling cattle, and they failed to give public notice of any retained interest in the cattle even though they knew Olsen purchased and sold cattle in his name. 403 N.W.2d at 664. This court does not believe that *Olsen* wrote the entire "for sale" requirement out of the statute. It appears more likely, given the court's quotation from *In re Novak*, that the facts in *Olsen* supported a finding that the cattle were delivered "at least in great part for ultimate sale."

UCC 2–326 is not a cure-all for all hidden ownership interests. There are a number of circumstances as recognized by the bankruptcy court where cattle may be on a farm without notice of ownership, yet are not subject to the interests of the farmers creditors. *See, e.g., In re Groff*, 898 F.2d 1475 (10th Cir.1990) (cattle owned as part of a joint venture between Groff and Pickering were not subject to the creditors of Groff in his individual capacity). Moreover, even if the Zwagerman/Bradley arrangement had been one purely for fattening with no eventual sale, it would have looked the same to the creditors.

The bankruptcy judge found that the delivery in the instant case was not "for sale". This is a factual determination and this court is bound by that factual determination unless it finds that it is clearly erroneous.

The bankruptcy court's finding was based on the following reasoning:

> There was no agreement between Bradley and Zwagerman that Zwagerman would acquire ownership in the cattle. No price was agreed upon. Sale was not to take place until sometime in the future at which time Zwagerman would sell as agent for Bradley, at a price agreeable to Bradley, and the entire proceeds of the

sale would be sent to Bradley less a shrinkage fee.

Bankruptcy Court Opinion (hereinafter "Opinion") dated June 19, 1990, at p. 548.

The court finds that the goods were not delivered to Zwagerman "for sale." It is not clear whether "for sale" refers to the sale to the buyer or resale by the buyer to third parties. But, delivery was not "for sale" in either event. As stated above, the delivery was for the care, feeding, and fattening the cattle. It would have been far more economical for Bradley to sell or to have someone in Tennessee sell the cattle and save shipping and shrinkage costs.

Opinion, p. 549.

The Bankruptcy court sifted carefully through the complex facts of this case and found a failure to satisfy the "for sale" requirement of UCC § 2–326. There is ample evidence in the record to support the bankruptcy court's finding. The contracts say nothing about a sale of cattle to Zwagerman. Bradley testified that he delivered his cattle to be fattened rather than to be sold. The primary purpose of the contract was for fattening because the available feed was better in Michigan. The sale of the cattle was incidental to the fattening contract.

Zwagerman was not obligated to pay for the cattle upon delivery. Bradley received no money from the arrangement until after the cattle were fattened and sold, at which time he was to receive the entire sale proceeds. Bradley spoke with Zwagerman 2–6 times a week to discuss market conditions and to give directions on the sale of the cattle. Bradley bore the risk and obtained the benefit of fluctuations in the market price. Zwagerman's only remuneration came from his feeding of the cattle. Zwagerman received no profit or commission on their sale.

While the question is a close one, the factual finding that the delivery was not "for sale" is not clearly erroneous and will not be upset on appeal.[2]

*Preferential Transfer*

■ The Trustee seeks to recover all payments made by Zwagerman to Bradley during the 90 days immediately prior to filing on the theory that those payments were avoidable preferences under 11 U.S.C. § 547.

The first requirement for a preference is that the transfer be of an interest of the Debtor in the property.

A transfer is preferential only if the property or the interest in property transferred belongs to the debtor.... The fundamental inquiry is whether the transfer diminished or depleted the debtor's estate.

4 Collier on Bankruptcy § 547.03[2] (15th ed. 1990). In light of this Court's determination above, the money paid never belonged to Zwagerman, or was held by Zwagerman as trustee of a constructive trust for the benefit of Bradley. Accordingly, the transfer did not involve property belonging to the debtor, so there could be no preference.

■ Moreover, this Court agrees with the bankruptcy court's alternative holding that payments were made in the ordinary course of business in accordance with 11 U.S.C. § 547(c)(2). The question of whether payments were made in the ordinary course of business is a "peculiarly factual" analysis. *In re Fulghum Construction Corp.*, 872 F.2d 739, 743 (6th Cir.1989). As such, it will not be disturbed on appeal unless it is clearly erroneous. Bankr.R. 8013.

■ "Even if the debtor's business transactions were irregular, they may be considered 'ordinary' for purposes of § 547(c)(2) if those transactions were consistent with the course of dealings between the particular parties." *Id.* at 743. Payments may be considered "ordinary" even if they were made on an irregular basis and the debtor was allowed to maintain a

---

**2.** Because this Court has determined that Zwagerman did not hold the cattle "for sale", it is not necessary to address the bankruptcy court's alternative basis for finding that UCC 2–326 does not apply, i.e., the finding that Zwagerman did not maintain a place of business at which he dealt in cattle.

significant amount owing to the creditor at all times. *In re White,* 58 B.R. 266, 270 (B.C.E.D.Tenn.1986) (*cited in In re Fulghum,* 872 F.2d at 743).

■ Under the fattening contracts Zwagerman was to pay Bradley when he sold the cattle. Over time his payments were later and later. Nevertheless, this is how Bradley and Zwagerman had operated for a period of time. Although Zwagerman was defrauding Bradley there is no evidence that Bradley had any suspicions that anything was wrong. In fact, he continued to transact business with Zwagerman in their normal fashion until he learned of the imminent bankruptcy.

The bankruptcy court's determination that the payments were not preferences must be affirmed.