

1995 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-29-1995

# Glenshaw v Ontario Grape

Precedential or Non-Precedential:

Docket 94-3722

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1995

Recommended Citation

"Glenshaw v Ontario Grape" (1995). *1995 Decisions*. Paper 260.
http://digitalcommons.law.villanova.edu/thirdcircuit_1995/260

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1995 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT


No. 94-3722


GLENSHAW GLASS COMPANY, a Pennsylvania Corporation

V.

ONTARIO GRAPE GROWERS' MARKETING BOARD;
AGRICULTURAL PRODUCTS BOARD OF AGRICULTURE CANADA,
                                        Appellants


ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA
(D.C. Civil No. 91-00941)


Argued July 28, 1995

Before:  NYGAARD and McKEE, Circuit Judges and
              FULLAM, District Judge*

(Opinion Filed  September 29, 1995)

GEFF BLAKE, ESQUIRE (Argued)
HENRY F. SIEDZIKOWSKI, ESQUIRE
Elliott, Reihner, Siedzikowski, North & Egan
400 Spruce Street
300 Mellon Bank Building
Scranton, PA 18503
Attorney for Appellants

RICHARD F. RINALDO, ESQUIRE (Argued)
Meyer, Unkovic & Scott
1300 Oliver Building
Pittsburgh, PA 15222
Attorney for Appellee

AMY J. GREER, ESQUIRE
Eckert Seamans Cherin & Mellott
42nd Floor, 600 Grant Street
Pittsburgh, PA 15219
Attorney for Appellee

* Honorable John P. Fullam, Senior United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

OPINION OF THE COURT


NYGAARD, Circuit Judge.

This case arises from the Chapter 11 bankruptcy of Keystone Foods, Inc. of North East, Pennsylvania. The Ontario Grape Growers' Marketing Board and the Agricultural Products Board of Agriculture Canada appeal from the district court's order awarding Glenshaw Glass Corporation the sale proceeds of certain grape products processed and stored by Keystone on behalf of appellants. We will reverse.

I.

A. The Parties

Keystone was a farm cooperative that processed and sold food products, including grapes, for its member farmers. Keystone had three main divisions: 1) an industrial sales division, which processed and sold bulk fruit juice; 2) a retail sales division, which bottled and packaged fruit juice, provided either by its members or purchased on the open market; and, 3) a division that processed, such as pressing grapes and concentrating the juice, and packed them for third parties. Pursuant to packing and processing agreements, food products on Keystone's premises were not included in Keystone's inventory unless and until Keystone actually purchased them.

For several years, Keystone had borrowed money from the Baltimore Bank for Cooperatives, now called the National Bank of Cooperatives. The Bank held a perfected first priority security interest in Keystone's present and future accounts, inventory, equipment, contract rights, goods, general intangibles and other property, and a first mortgage on Keystone's real property. It is undisputed that the Bank had first priority with respect to these items.

Glenshaw, the plaintiff below, sold glass containers to Keystone for use in bottling juice. After the Bank perfected its security interest, Glenshaw obtained and perfected a similar all-encompassing security interest in Keystone's present and future assets, including its inventory.

The defendant/appellants, whom we shall collectively call the Grape Growers, are Ontario Grape Growers' Marketing Board, which acts as an agent for co-appellant/co-defendant Agricultural Products Board of Agriculture Canada, which purchases, processes, stores, ships and sells surplus Canadian agricultural products, including surplus Canadian-grown grapes. Each annual grape harvest represents an individual "Surplus Grape Program."

B. The Contracts Between Keystone and the Grape Growers

On September 15, 1988, the Grape Growers and Keystone entered into two agreements important to this litigation. At the time, Keystone owed the Grape Growers more than $450,000 for Keystone's purchases pursuant to the 1987 Canadian Surplus Grape Program. When the Grape Growers needed processing and storage

services for the 1988 Surplus Grape Program, it allowed Keystone to work off its debt by processing 1988 surplus grapes and storing the juice and concentrate.

The primary contract was the "Processing and Storage Agreement," under which the Grape Growers shipped grapes to Keystone for custom processing, juice concentrating and storage. Keystone agreed ultimately "to return to the Board juice or concentrate" resulting from the processing. As for grapes in processing or storage at Keystone's facilities, the agreement clearly stated:

> Title to all grapes processed by Keystone under this Agreement, and to all juice or concentrate resulting from such processing, shall be in the Board [i.e. the Grape Growers], and nothing contained herein, and no act of Keystone or the Board, shall cause Board title to vest in Keystone, except by a bill of sale or other title of transfer instrument being executed by the Board.

Nothing in the Agreement gave Keystone authority to use or sell the appellants' grapes or grape product.

The second agreement, executed on the same day, was the "Purchase Agreement." This contract gave Keystone an option, until October 1989, to purchase certain amounts of the grapes delivered to it for processing and storage by the Grape Growers. Keystone agreed "[n]ot to use or sell any of the grapes, juice or concentrate without receiving the prior written consent of the Board in the form of a stock release issued by the Board."

C. Course of Dealing Under the Contracts

4

Pursuant to the Processing and Storage Agreement, the Grape Growers shipped 1988 surplus Canadian-grown grapes to Keystone. When the grapes were delivered, Keystone did not pay for the grapes, nor were they included in Keystone's inventory. Rather, Keystone regularly sent invoices to the Grape Growers reflecting Keystone's charges for processing, concentrating, storing and loading the grapes. Those charges were deducted from Keystone's debt to the Grape Growers from the 1987 Surplus Grape Program. In total, the Grape Growers delivered nearly 7,000 tons of grapes to Keystone pursuant to the Processing and Storage Agreement.

In November 1988, without prejudice to the Grape Growers' ownership rights in the grapes delivered under the Processing and Storage Agreement, the parties amended the agreement to give the Grape Growers a security interest in the grapes in the event the Grape Growers were deemed not to own them. In December 1988, the Grape Growers perfected this security interest by filing the proper financing statement, which indicated that it was being filed without prejudice to the Grape Growers' claim to ownership of the grape product.

The Grape Growers assert that the decision to obtain a security interest in the grapes was made in October 1988 after they discovered that Keystone had converted some of the Grape Growers' grapes, contravening the parties' agreement that the grapes only be processed and stored for the Grape Growers. The district court, however, found that the Grape Growers discovered this violation in May 1989 rather than in October 1988. Because

5

it does not affect our decision, we will accept the district court's finding. Upon discovering the unauthorized use of its grape product, the Grape Growers, after the fact, formally released the product to Keystone, which paid the Grape Growers the sales price and a sales commission.

In a separate transaction in February 1989, Keystone made one purchase pursuant to the Purchase Agreement, in the amount of $93,325.00. The Grape Growers issued a formal, written release of the product to Keystone in accordance with the Purchase Agreement. The Grape Growers also received a commission on the sale.

        D.   The Keystone Bankruptcy and the Grape Growers'
            Removal of the Grape Product from the Bankruptcy
            Estate

On June 9, 1989, Keystone filed a voluntary Chapter 11 petition in Bankruptcy. Keystone's largest creditors were the Bank, to which it owed approximately $1.8 million, and Glenshaw, to which it owed approximately $1.6 million.

On June 28, 1989, the bankruptcy court held a hearing to discuss preliminary matters. In re Keystone Foods, Inc., No. 89-00318E (Bankr. W.D. Pa. June 28, 1989). Counsel for the Grape Growers attended the hearing, at which the parties discussed the Grape Growers' claim to the grapes delivered to Keystone under the Processing and Storage Agreement and the resulting grape product. The bankruptcy court noted that the Grape Growers' contingent security interest created an ambiguity as to which party had priority in the grape product. Although

6

sale of the grape product at issue was discussed, the court did not authorize the Grape Growers or any other party to make a sale.

Despite the bankruptcy, and without informing the bankruptcy court or Keystone's creditors, the Grape Growers sold the grape product to third parties and removed it from Keystone's premises. The Grape Growers made a series of sales beginning immediately after the June 28, 1989 bankruptcy hearing and continuing at least until November 1989. Neither the Bank nor Glenshaw became aware of the sales or removal of product from Keystone's premises until after November 1989. Keystone itself remained in business after its bankruptcy filing until May or June 1990, following a liquidation of its assets in February 1990.

E.  Assignment of Claims to Glenshaw

The Bank, Glenshaw and Keystone entered into a settlement agreement, which was approved by order of the bankruptcy court. In Re Keystone Foods, Inc., No. 89-00318E (Bankr. W.D. Pa. 1991) (unpublished order). The settlement authorized Glenshaw to pursue any claims of the Bank, Keystone and Glenshaw, against the Grape Growers, which arose out of the Processing and Storage Agreement, the Purchase Agreement, and the Grape Growers' post-petition removal of the grape product from the Keystone bankruptcy estate.

F.  Proceedings in the District Court

On June 7, 1991, two days after the bankruptcy court approved the settlement agreement, Glenshaw sued the Grape

7

Growers, seeking damages for breach of contract, conversion and willful violation of the automatic stay. The district court found in Glenshaw's favor on its claims for conversion and willful violation of the automatic stay. It held that, in addition to processing and storage, the grapes were also delivered to Keystone for sale, and thus should be treated as consigned goods under 13 Pa. Cons. Stat. § 2326, (c) which states:

> Consignment sales -- Where goods are delivered to a person for sale and such person maintains a place of business at which he deals in goods of the kind involved, under a name other than the name of the person making delivery, then with respect to claims of creditors of the person conducting the business the goods are deemed to be on sale or return. The provisions of this subsection are applicable even though an agreement purports to reserve title to the person making delivery until payment or resale or uses such words as "on consignment" or "on memorandum." However, this subsection is not applicable if the person making delivery:
>
> (1) complies with an applicable law providing for the interest of a consignor or the like to be evidenced by a sign;
> (2) establishes that the person conducting the business is generally known by his creditors to be substantially engaged in selling the goods of others; or
> (3) complies with the filing provisions of Division 9 (relating to secured transactions).

In addition, subsection (b) provides that goods held on sale or return are subject to claims of creditors of the buyer while it holds them. Thus, the district court held that, even though the Grape Growers purported to reserve title to the

8

grapes, section 2326 required that the grape deliveries be deemed consignments, making them part of the bankruptcy estate pursuant to subsection (b). The court then found that the Bank and Keystone each had priority to the grape product over the Grape Growers because the Grape Growers had failed to establish that any of the exceptions in subsections (c)(1)-(3) applied. The district court held that, because the Grape Growers failed to give notice to Keystone's creditors or file its financing statement covering the grapes and grape product before delivering the grapes to Keystone, as required by 13 Pa. Cons. Stat. §9114(a)(1), the Grape Growers failed to satisfy the notice/filing exception set forth in section 2326(c)(3). Therefore, the Bank's security interest in Keystone's property gave it priority over the Grape Growers as to the grapes and grape product at issue. In turn, Glenshaw, by virtue of its assignment of claims from the Bank, also had priority over the Grape Growers. In addition, the district court held that the Grape Growers' removal of the grape product from Keystone's premises constituted a violation of the automatic stay provision of the Bankruptcy Code, 11 U.S.C. §362.

The district court awarded damages to Glenshaw, as assignee of the claims of the Bank and Keystone, in the amount of the total sale proceeds the Grape Growers realized in post-petition sales of the grape product -- $1,365,452 plus interest from the date of the conversion.

On appeal, the Grape Growers argue that the district court erred in five respects: (1) by treating the grapes the

9

Grape Growers delivered to Keystone merely for processing and storage as goods on consignment under section 2326, thus subjecting the resulting grape product to the claims of Keystone's creditors; (2) by holding that Glenshaw took priority over the Grape Growers as to the grape product even if it was properly deemed to be on consignment; (3) by holding that the Grape Growers violated the automatic stay; (4) by admitting into evidence a handwritten memorandum by an attorney for the Grape Growers that suggested that the Grape Growers intentionally failed to notify Keystone's creditors of the Grape Growers' interest in the grape product; and (5) in calculating damages.

II.

The central issue is whether section 2326 subjects the grapes delivered by the Grape Growers to Keystone for processing and storage to the claims of Keystone's creditors. Two sub-issues emerge: (1) was this a consignment transaction? and (2) if not, does section 2326 apply to bailment transactions not involving a consignment?

A. Was this a Consignment?

Generally, there are two types of consignments -- true consignments and security consignments. Armor All Products v. Amoco Oil Co., 533 N.W.2d 720, 725 (Wis. 1995). A true consignment creates an agency pursuant to which goods are delivered to a dealer for the purpose of resale; the consignor usually requires the consignee to charge a certain price for the goods. Id. A security consignment, on the other hand, occurs

10

when the delivering party agrees to take the goods back in lieu of payment by the receiving party if the latter fails to sell them; to provide security to the consignor, title to the goods remains in the consignor's name. Id. In both situations, goods are delivered for sale -- that is, for sale by the receiving party.

In contrast, a bailment occurs when property is entrusted to a party temporarily for some purpose; upon the fulfillment of that purpose the property is "redelivered to the person who delivered it, otherwise dealt with according to his directions or kept until he reclaims it." Smalich v. Westfall, 269 A.2d 476, 480 (Pa. 1970). Although every consignment involves a bailment of sorts because the goods are entrusted for the purpose of sale, not every bailment is a consignment. Armor All Products, 533 N.W.2d at 727 (a bailment without more does not create a consignment).

We conclude that the transaction was a bailment, but not a consignment. Neither the Processing and Storage Agreement nor the Purchase Agreement, whether read individually or collectively, gives Keystone the right to sell the Grape Growers' product. The grapes were delivered to Keystone only for processing and storage. Afterwards, the grapes were to be redelivered to the Grape Growers or otherwise dealt with according to the Grape Growers' directions.

Furthermore, the fact that the grape product would ultimately be sold to other parties by the Grape Growers does not alter the foregoing analysis because the Grape Growers, the

11

bailor, would both conduct and control the eventual sale.  In re Zwagerman, 125 B.R. 486, 491 (W.D. Mich. 1991) (no consignment when holder of the goods would process them and return them for later sale by the owner).  The fact that Keystone held an option to purchase some of the grapes pursuant to the Purchase Agreement does not make the transaction a consignment; indeed, that fact militates against such a result.  E.g., In re Sitkin, 639 F.2d 1213, 1217 (1st Cir. 1981) (citations omitted), ("A bailment may still exist where the bailee has a continuing option to purchase or to sell.").  As to those grapes that Keystone did opt to purchase, the Grape Growers made the sale, received a sales commission, and exercised no control over the grapes or their resale pricing thereafter.

Therefore, to the extent that the district court found that the Grape Growers delivered the grapes to Keystone for sale, this finding was clearly erroneous.  The record demonstrates that, consistent with the contracts and the parties' course of dealing, the grapes were delivered to Keystone merely for processing and storage.

B.  Does Section 2326 Apply?

Having determined that the Grape Growers' delivery of grapes to Keystone for processing and storage constituted a bailment, but not a consignment or bailment for sale, the question is whether section 2326 applies to bailments in which the bailee has no authority to sell the bailor's goods.

Emphasizing that, by its plain language, section 2326 applies when goods are "delivered for sale," the majority of

12

courts have held that goods not delivered to a party for sale do not come within the scope of section 2326. See, e.g., Evergreen Marine Corp. v. Six Consignments of Frozen Scallops, 4 F.3d 90 (1st Cir. 1993) (following In re Sitkin) ("[T]emporary entrustments of possession by a bailee, without more, are not 'sales on consignment,' within the meaning of UCC § 2-326."); Walter F. Heller & Co. v. Riviana Foods, Inc., 648 F.2d 1059 (5th Cir. 1981) (By its terms, section 2326 applies only when goods are delivered "for sale."); In re Key Book Service, Inc., 103 B.R. 39 (Bankr. D. Conn. 1989) (delivery of books, merely for shipping, billing and warehousing, is not a "delivery for sale" under section 2326).

We too conclude that section 2326 does not apply to bailments under which, as here, the bailee is merely entrusted with temporary possession of the bailor's goods and has no authority to sell them. First, and most importantly, the plain language of the statute requires that the goods have been "delivered for sale." It is a mistake to require the bailee to invoke one of the exceptions set forth in subsections (c)(1)-(3) when the bailor's creditors have failed, as here, to demonstrate that the language in the main body of the statute is applicable.

Second, even the language in the statute regarding reservation of title indicates that the statute was intended to apply to consignments: "[Section 2326(c) is] applicable even though an agreement purports to reserve title to the person making delivery until payment or resale or uses such words as 'on consignment' or 'on memorandum.'" 13 Pa. Con. Stat. §2326(c).

13

Thus, the section clearly contemplates sales to ("payment") or by ("resale") the receiver of the goods.

Third, the official comment to section 2326 reveals that the section was intended to apply to consignments:

> The type of "sale on approval," "on trial" or "on satisfaction" dealt with involves a contract under which the seller undertakes a particular business risk to satisfy his prospective buyer with the appearance or performance of the goods in question. The goods are delivered to the proposed purchaser but they remain the property of the seller until the buyer accepts them....The type of "sale or return" involved herein is a sale to a merchant whose unwillingness to buy is overcome only by the seller's engagement to take back the goods...in lieu of payment if they fail to be resold.

Official UCC Comment 1, section 2326. Thus, section 2326 is concerned with eliminating, as to the rights of a consignee's creditors, the difference between true consignments and security consignments. Armor All Products, 533 N.W.2d at 726; see also Official Comment 2, section 2326 (As against creditors of the "buyer..., words such as 'on consignment' or 'on memorandum,' with or without words of reservation of title in the seller, are disregarded when a buyer has a place of business at which he deals in goods of the kind involved....") (emphasis added). There is no indication that the section was intended to eliminate the distinction between consignments and situations where a party is merely entrusted with temporary possession of goods and has no authority to sell them. Armor All Products, 533 N.W.2d at 726.

Finally, that the bailee's creditors think an

14

entrustment of goods looks like a consignment does not persuade us that section 2326 should encompass both situations. As the In re Zwagerman Court opined, there are a number of circumstances in which goods may be on the premises of the bankrupt party and not be subject to the interests of creditors. 125 B.R. at 491 (citing In re Groff, 898 F.2d 1475 (10th Cir. 1990) (cattle owned as part of a joint venture between debtor and another were not subject to claims of creditors of debtor in his individual capacity)). Thus, we agree that section 2326 "is not a cure-all for all hidden ownership interests." Id. Moreover, modern commercial lenders do not extend credit based on a debtor's "ostensible ownership of merchandise. Today creditors either investigate that appearance or do not rely on it at all." Armor All Products, 533 N.W.2d at 729 (quoting John Dolan, The UCC's Consignment Rule Needs an Exception for Consumers, 44 Ohio St. L.J. 21, 29 (1983)).

We conclude that the court erred by applying section 2326 to this transaction, and the grape product in question neither became part of the Keystone bankruptcy estate, nor subject to the claims of Keystone's creditors.

III.

Finally, Glenshaw argues that, even if the grapes were not delivered to Keystone for sale pursuant to a consignment transaction, it is nonetheless entitled to recover damages because the Grape Growers violated the automatic stay provision of the Bankruptcy Code, 11 U.S.C. § 362.

15

Under § 362(a), a voluntary Chapter 11 bankruptcy filing operates as a stay of "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate...[and] any act to collect, assess, or recover a claim against the debtor that arose before the commencement of [the case]...." Parties injured by a willful violation of the automatic stay are entitled to seek actual damages, costs and attorneys' fees, and punitive damages. 11 U.S.C. § 362(h).

The district court determined that the Grape Growers violated the stay by selling and then removing the grape product from Keystone's premises. We need not decide whether that determination was proper. Although Glenshaw's complaint requested both actual and punitive damages, the district court awarded only actual damages -- the $1,365,452 in sale proceeds realized by the Grape Growers from the post-petition sale of the product -- for both conversion of estate property and violation of the automatic stay. We have already determined that Glenshaw is not entitled to recover the sale proceeds because the grape product never became part of the bankruptcy estate. Inasmuch as Glenshaw is unable to support a basis for recovering actual damages, we need go no further.

IV.

We conclude that the district court erred by determining that section 2326 applied to the grape product in question. The grapes were delivered under bailment to Keystone and thus never became part of the bankruptcy estate under section

16

2326. Accordingly, we will vacate the award of damages to Glenshaw.